IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2022

**STATE OF TENNESSEE v. TIMOTHY M. DAWSON**

**Appeal from the Criminal Court for McMinn County**
**No. 17-CR-297      Sandra Donaghy, Judge**

_____

**No. E2021-00912-CCA-R3-CD**

_____

The Defendant-Appellant, Timothy M. Dawson, was convicted by a McMinn County Criminal Court jury of theft of property of more than $2,500 but less than $10,000, a Class D felony. See Tenn. Code Ann. §§ 39-14-103; 39-14-105(a)(3). During a consolidated sentencing hearing on the Defendant's convictions from three separate trials, the trial court sentenced the Defendant as a career offender to 12 years' incarceration, to be served consecutively to the sentences from his other two convictions. On appeal, the Defendant contends that 1) the evidence was insufficient to establish the value of the stolen property; and 2) the trial court erred in denying the Defendant's motion of acquittal, or in the alternative, erred in denying his motion for new trial. After careful review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

Andrew E. Bateman, Athens, Tennessee, for the Appellant, Timothy Michael Dawson.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Matthew Dunn and Heather Miller, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The instant case, 17-CR-297 ("Case 297"), stems from the theft of a large air conditioning unit that was attached to a house. The Defendant also had two other trials for

case numbers 17-CR-295[1] ("Case 295") and 17-CR-296[2] ("Case 296") during the same week as the trial for the instant case. The Defendant was convicted of simple possession of methamphetamine in Case 295 and theft of property of more than $1,000 but less than $2,500 in Case 296. The trial court held a consolidated sentencing hearing for all three cases on December 17, 2018.

At the September 13, 2018 trial[3] for the instant case, Claudia Bruce testified that she filed a police report on April 1, 2017, after noticing that the external air conditioning unit attached to the house she was selling had been stolen. She noticed that the "big" unit was missing when she arrived at the house for a showing. Bruce explained that she and her husband, Michael Bruce, lived in the house for 15 years before deciding to sell it, and the air conditioning unit was attached to the house when they purchased it. She denied giving anyone consent to remove the unit from the home. The area of the house where the unit had been attached was "very damaged" and "broken[.]" She elaborated that "[t]hey had to redo everything" because the area was in such "bad shape." Bruce also observed tools, including a screwdriver, on the ground next to where the unit had been previously attached to the house. McMinn County Sheriff's Office ("MCSO") officers informed Bruce and her husband that they were "looking for someone who was stealing a few things around the neighborhood" and that they located an air conditioning unit in a field that was "very close" to the Bruces' house.

Bruce testified that the MCSO officers took her and her husband to the field, which was "three, four minutes" from their house, to identify their air conditioning unit. She verified that the unit in the field was the same one that had been removed from their house. She knew it was the same unit because she had lived with it for 15 years, and it had a "gray color tag" on top. Further, the officers allowed the Bruces to take the unit back to their house, and she verified that it was the same "size of the opening" left by the missing unit.

---

[1] This court filed its direct appeal opinion for Case 295 on June 21, 2022, affirming the Defendant's conviction for simple possession of methamphetamine. See State v. Timothy M. Dawson, No. E2021-00313-CCA-R3-CD, 2022 WL 2204366, at *1 (Tenn. Crim. App. June 21, 2022).

[2] We note that this court recently reversed and remanded the Defendant's conviction for theft of property in Case 296 for a new trial. See State v. Timothy Mitchell Dawson, No. E2021-00913-CCA-R3-CD, 2022 WL 1565627, at *8 (Tenn. Crim. App. May 18, 2022).

[3] The record reflects that the State filed a motion in limine on September 10, 2018, asking the trial court to hold a Rule 404(b) hearing to determine whether the State could introduce evidence of Case 296 in the instant case, noting that the trial for Case 296 would be completed by trial. The motion is not referenced again in the record on appeal, but this court's opinion in Case 296 indicates that the trial court disallowed the State from presenting evidence of Case 296 in the instant case after concluding that the probative value of such evidence was outweighed by the danger of unfair prejudice. See Timothy Mitchell Dawson, 2022 WL 1565627, at *4 n.1.

Bruce elaborated that "Mr. Ernest," who had serviced their unit for 15 years, also verified that the unit found in the field was the same unit that was removed from the house. She agreed that the damage done to the unit matched the damage done to the side of her house. The unit was unable to be reattached to the house due to the damage. Bruce replaced the unusable air conditioning unit with a similarly-sized one, which cost the Bruces $5,000. The Bruces replaced the unit as soon as possible in order to sell their house. Photographs of the unit found in the field and the side of the Bruces' house were admitted into evidence.

On cross-examination, Bruce reiterated that the house was for sale and unoccupied at the time the unit was stolen. She explained that either she, her husband, or the person who took care of the yard checked the house almost every day, "[m]ost of the time." Bruce agreed that the yard worker was there "a day or two" before she noticed the unit missing but apparently did not say anything to her about a missing unit. Bruce testified that the theft could have occurred on "the 30th or the 29th," though she did not notice it missing until April 1. She stated that MCSO officers tested the tools recovered from her house for fingerprints. Bruce agreed that the unit was recovered in a field on Ealion Lance's property and that it took "[f]our or five people" to lift the unit out of the field onto a trailer. It took two or three people a day to install the new unit. Bruce explained that she had "Mr. Ernest" and his team install a new unit quickly so that she could sell the house.

MCSO Corporal Kevin Gray testified that he went to Lance's property on April 1, 2017, to help someone "retrieve some items around back near the creek." While driving through the back side of the property, Corporal Gray observed a "residential central heat and air unit" lying across a hill "out of view from the roadway." Corporal Gray noticed that the unit still had "parts of ductwork kind of attached to i[t] and some insulation [that] looked like it [had] recently been taken off a residence," which he thought was "odd[.]" Later the same day, Corporal Gray was called to the Bruces' house, which was "the next county road over" from Lance's property, for the theft of a "central heat and air unit." Corporal Gray called MCSO Detective Tim Carver to the crime scene. Corporal Gray testified that the condition of the Bruces' house indicated that the unit had been removed quickly and "wasn't professionally taken off." Corporal Gray realized that the unit he saw on Lance's property earlier in the day matched the size and description of the unit stolen from the Bruce house, and he relayed that information to Detective Carver. Corporal Gray noticed tire tracks in the grass leading away from the Bruces' house and towards Lance's property, rather than "back towards the main highway[.]" Detective Carver and Corporal Gray then responded to Lance's property, which was "less than a mile" from the Bruces' house.

Corporal Gray testified that when he and Detective Carver arrived at Lance's property, he observed that the "insulation, ductwork, and all that seemed to be similar" to what was on the side of the Bruces' house. He pointed out the similarities in the

- 3 -

photographs taken of the unit in the field and the Bruces' house. He agreed that the Bruces confirmed that the unit in the field was the same one removed from their house. At Lance's property, Corporal Gray also observed an all-terrain vehicle ("ATV") that was "shoved back up" into a "little bit thicker wooded area" approximately 20 yards away from the unit. Corporal Gray was unsure of the "exact acreage" of Lance's property but stated that it was a "pretty good-sized piece of property." He clarified that the property contained a house and a single-wide mobile home, and there was an access road that "went way down onto the property and circle[d] all the way back around where the creek and open field are." The unit was located on top of a hill, approximately "150, 200 yards" off the main road and "probably 50 to 75 yards from [Lance's] house[.]" Corporal Gray identified photographs of the ATV, which were admitted into evidence. [II, 51]. He noted that the ATV had an "aftermarket LED[-]style spotlight on the front of it, as well as a rack system which [wa]s probably for a gun, but there's some type of saw that was strapped" to it. He agreed that he had seen a photograph of the Defendant on "an ATV similar to that[.]"

On cross-examination, Corporal Gray agreed that he responded to the Bruces' house on April 1 but that he was unsure when the unit was actually removed from the house. He further agreed that the unit had been "haphazardly removed" from the house. He was unsure whether any gas lines were "shut off" at the Bruces' house and did not think that they called anyone to check the gas lines. Corporal Gray reiterated that the unit he observed on Lance's property was 150 to 200 yards from the main road and 50 to 75 yards from the house. He stated that it was "possible" that the house was visible from the unit, although the "dense woods" might prevent such. He agreed that you could probably hear "cars passing on the road" from where the unit was located on the property and could "probably" hear "from [the] house[.]"

Ealion Lance testified that his late wife and the Defendant's mother were first cousins and that he had known the Defendant "all his life." He explained that his property consisted of 12 acres with a creek that "runs all the way around the back side" and a road that "runs all the way up the front side[.]" The Defendant had been to Lance's property "all his life" and knew "every inch of it[.]" Lance explained that his property was "50/50" wooded area and grass. Lance testified that he saw the Defendant on his property sometime between March 26 and March 28, 2017. The Defendant was "down by [Lance's] house" retrieving junk metal from a burnt camper, which Lance's daughter had given him permission to do. Lance saw the Defendant with a truck with a "16-, 18-foot trailer behind it" and "an old air conditioning unit s[i]tting on" the trailer. Lance did not speak to the Defendant at that time. Later the same day, a "bail bondsman" came to Lance's house and asked if he knew where the Defendant was, and Lance pointed out where the Defendant was on the property.

- 4 -

Lance agreed that MCSO officers came to his property on April 1, 2017, and asked if he knew that there was an air conditioning unit sitting in his field. Lance was unaware that the unit was there and went with Corporal Gray and Detective Carver to look at it. He did not see the exhaust and intake areas of the unit that was on the Defendant's trailer because of the way it was positioned but agreed that the part of the unit he observed on the trailer was consistent with the unit later found in the field, though he noted that "[m]ost of those square units [look] basically the same on one side." Lance denied stealing the unit, securing the unit at anyone's request, being in the heating, ventilation, and air conditioning ("HVAC") business, or being asked by anyone to install a unit.

On cross-examination, Lance clarified that there were "three or fo[u]r days at most" between the time he observed the Defendant with the unit and the time Corporal Gray and Detective Carver came to his property and asked about the unit. He thought that the unit he observed on the Defendant's trailer might have had "surface rust on it" but was not sure. He did not "pay [] attention" to the unit on the Defendant's trailer and only noticed that it was a "square unit[.]" He could not say with certainty whether the unit on the Defendant's trailer and the unit found in his field were the same unit because he did not, and could not, see the side of the unit on the Defendant's trailer where the insulation would have been visible. Lance agreed that the unit on the Defendant's trailer looked like "an old junky unit[.]" He explained that the unit was located 200 to 250 feet from his house, but he did not see or hear anyone place the unit there. Lance agreed that he helped load the unit onto a trailer after Corporal Gray and Detective Carver located it on his property and that it took four or five people to "slid[e] it" into the trailer. He explained that he had lived on the property for almost 55 years at the time of trial, and "[e]verybody in the whole community" came to the "swimming hole" on his property. Lance agreed that there were people in and out of his property "all the time" and that he had found dumped objects on his property on at least one previous occasion.

Lance testified that the burnt camper where the Defendant was collecting junk metal was "[p]robably 200 feet" from his house. He elaborated that the unit was found in weeds approximately 25 to 40 feet behind the burnt camper. Lance stated that his daughter placed the camper on his property while he was working out of town, and when he returned home from the trip a few days later, "the fire department was there and [the camper] had burnt up." The Defendant was collecting junk metal that "burnt off the camper" to sell when Lance saw him on his property. Lance agreed that there was "a lot of mess" created by the burnt camper and that his daughter informed him she was going to clean it up. He testified that he did not "go down in there" to the area around the burnt camper after he saw the Defendant there and did not see the unit there until Corporal Gray and Detective Carver informed him of its presence on April 1, 2017. Lance testified that he had been convicted of "sell[ing] and deliver[ing]" cocaine in 1985.

On redirect examination, Lance agreed that he gave a written statement to Detective Carver on April 1, 2017, which he reviewed before signing. He thought the statement would "most likely" help him recall the dates surrounding the events to which he testified. After refreshing his recollection from his statement, Lance testified that his statement reflected that he reported March 28, 2017, as the date he saw the Defendant on his property. He stated that the unit was found in the field 25 to 30 feet from the burnt camper and 15 to 20 feet from where he had seen previously the Defendant with the truck, trailer, and unit.

On recross-examination, Lance testified that March 28, 2017, was the date that Detective Carver wrote down as the day Lance saw the Defendant with the unit on his trailer, but he was unsure if that was the correct date because he could not actually remember which day he saw the Defendant. He did not see the unit on his property until April 1 and did not know what day the Defendant's truck and trailer were removed from the property. Lance reiterated that he was unsure if the unit was on his property after the Defendant's truck and trailer were removed because he never went to that part of his property. On further redirect examination, Lance testified that the truck and trailer he saw with the Defendant were "the one[s the Defendant had] been driving[.]"

Mike Smith testified that he was employed by Out Quick Bond Company and agreed he went to Lance's property to look for the Defendant "around March 28, 2017[.]" He saw the Defendant next to a truck that was "back off the road over a little hill[,]" approximately a quarter-mile into the property. He was familiar with the Defendant's appearance prior to the encounter. The Defendant was approximately 30 yards from Smith when he first observed him, and the Defendant "jumped on" a large ATV and "took off" upon seeing Smith. Smith did not remember any details of the ATV's appearance. The Defendant drove the ATV down a "dirt road" and turned towards the fence line, where he got off the ATV and "jumped the fence."

When Smith first observed the Defendant on the property, the Defendant was standing by a pull-behind trailer with a wooden floor, which was sitting next to a pickup truck but not attached to it. The truck, trailer, and ATV were "all bunched up together." He elaborated that the truck, trailer, and ATV were "[m]aybe three feet apart," and the Defendant was standing by the back of the truck. Smith explained that after the Defendant fled, the two other men that were with him went to look for the Defendant in the woods, and Smith "got up on top of an air conditioner unit that was inside the trailer." He described the unit as a "central outside unit" that he believed was "[f]ive- to ten-ton." He reiterated that the unit was sitting in the trailer, which he described as "[a]n open trailer[,]" and he "got up on top of it so [he] could see around the area" to locate the Defendant. When shown the photographs of the unit located in the field, Smith stated that the unit he stood on and the unit in the field looked "similar[.]" Upon further questioning by the State, Smith clarified that the units looked "the same to [him]." Smith explained that they looked the

same because the unit he climbed on "look[ed] like it'[d] been pulled out of the wall or something" because "the ductwork was just scattered around[,]" and he could tell it had been "jerked out of the wall instead of eased out[.]" He identified the Defendant as the person he saw with the truck and trailer and fleeing on the ATV at Lance's property.

On cross-examination, Smith agreed that the unit felt "solid" when he stood on top of it. He observed insulation coming from the back of the unit, which had been "pushed upon the trailer so far you couldn't get to the front." He did not notice if the unit was rusty. The unit was old and not in good condition, but he believed it had been used recently due to the insulation still being "fresh[,]" like "it had been tor[n] out of a house or ductwork or something." Smith testified that he had "worked in maintenance for 20 years." He conceded that the insulation indicated only that the unit had been connected to a house and not necessarily that it had been used recently. He did not recall the exact date that he saw the Defendant at Lance's property but believed it was in March because his friend "passed away just a little bit later in there." He stated that his friend passed away "March the 27th or something like that[,]" and he agreed he saw the Defendant prior to his friend's passing.

MCSO Detective Tim Carver testified that he responded to the Bruces' house on April 1, 2017, to investigate the theft of their HVAC unit. Upon arriving at the crime scene, he observed the side of the home where the unit had been removed "in a hurry" based on the condition of the house. Detective Carver was unable to locate any fingerprints on the screwdriver found at the scene. He reiterated that Corporal Gray informed him that he saw a unit on Lance's property earlier in the day. Upon arriving at Lance's property, Detective Carver obtained consent to search the property from Lance, and Detective Carver and Corporal Gray located the unit in a field. He agreed that the unit in the field "appeared to match" the damaged area of the Bruces' house based on the ductwork. Detective Carver did not find anything else in the field near the unit but explained that Corporal Gray previously located an ATV near the unit, which Detective Carver saw when it was brought to the justice center. He agreed that he had seen photographs of the Defendant in possession of the ATV.

Detective Carver testified that he and Detective Greg Erps interviewed the Defendant on April 17, 2017, at the McMinn County Sheriff's office. Prior to speaking with the Defendant, Detective Carver advised him of his Miranda rights, and the Defendant acknowledged he understood those rights and signed a Miranda waiver. An audio recording of the interview was admitted into evidence and played for the jury. In the interview, the Defendant seemed to assert that Lance had possession of his trailer and had placed an HVAC unit on it to install at a different residence.[4] He further asserted in the

---

[4] We note that parts of the interview are indiscernible, and a transcript of the interview is not provided in the record on appeal.

- 7 -

interview that he had three witnesses who could prove that he did not steal the Bruces' HVAC unit if his case went to trial. Detective Carver testified that the Defendant informed him that he owned the ATV found near the unit.

On cross-examination, Detective Carter testified that he had already obtained a warrant for the Defendant's arrest when he interviewed him on April 17, 2017. When he interviewed the Bruces at their house on April 1, 2017, they believed the unit was stolen on March 28, 2017. He did not interview their yard worker or neighbors or test the recovered unit for fingerprints. Detective Carver described the unit recovered from the field as in "fairly good shape" with "rust on the gas line." A wrecker service responded to Lance's property, and four or five people helped push the Bruces' unit up the rollback truck so that the driver could attach chains to the unit and "hoist it up on the rollback." Detective Carver was unsure whether the Defendant's truck was equipped with an "assisted loading device[.]" The Defendant informed Detective Carver during his interview that he had a "bad knee and he'd had some kidney stones[.]" Detective Carver testified that Lance told him he saw the Defendant, and later Smith, at his property on March 28, 2017. He did not interview Smith. Detective Carver agreed that he did not have photographs or video depicting the Defendant stealing the HVAC unit or any fingerprint or DNA evidence linking him to the unit.

Following the close of the State's proof, the Defendant moved for judgment of acquittal, asserting that the State "failed to prove the elements of the indictment." The trial court denied the motion, reasoning that multiple witnesses testified to seeing the Defendant with an HVAC unit on his trailer that had ductwork and insulation still attached, consistent with the unit stolen from the Bruces' house. The Defendant elected not to testify on his own behalf. The jury found the Defendant guilty as charged. At the consolidated sentencing hearing on December 17, 2018, the trial court sentenced the Defendant as a career offender to 12 years' incarceration, to be served consecutively to the sentences from his other two convictions. The Defendant filed a motion for new trial on January 16, 2019, and an amended motion for new trial on October 16, 2020, asserting that the evidence was insufficient to establish the value of the stolen HVAC unit and that the trial court erred in denying the Defendant's motion for judgment of acquittal. The trial court held a hearing on the motion on December 4, 2020, and denied the motion by written order on March 15, 2021. The same day, the trial court entered a corrected judgment reflecting that the Defendant's sentence in Case 297 was to run consecutively to a conviction in Loudon County in addition to Cases 295 and 296. The Defendant filed a single notice of appeal on March 23, 2021, appealing the judgments in Case 295, Case 296, and the instant case, Case 297. On July 7, 2021, this court directed the Defendant to respond to whether all three cases should be consolidated for appeal. On July 19, 2021, the Defendant responded that he objected to the consolidation of his three cases on appeal, and on August 11, 2021, this court entered an order separating the three cases for appellate review and deeming the

notice of appeal in the instant case timely filed.  See Order, State v. Timothy M. Dawson, No. E2021-00313-CCA-R3-CD (Tenn. Crim. App. Aug. 11, 2021).  This case is now properly before this court for review.

## ANALYSIS

On appeal, the Defendant asserts that the evidence is insufficient to support his conviction for theft of property over $2,500 but less than $10,000 and that the trial court erred in denying his motion for judgment of acquittal.  He further contends that the trial court should have granted him a new trial as the thirteenth juror under Tennessee Rule of Criminal Procedure 33(d).  The State responds that "the jury had sufficient evidence to determine that the [D]efendant stole the air conditioning unit and that the value of the unit exceeded $2,500."[5]

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).  "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).  When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with

---

[5] As noted by the State, the jury received the proper instruction for defining "value."

- 9 -

guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Theft is a "Class D felony if the value of the property or services obtained is two thousand five hundred dollars ($2,500) or more but less than ten thousand dollars ($10,000)[.]" Tenn. Code Ann. § 39-14-105(a)(3). "Value," as relevant to the instant case, is defined as either "[t]he fair market value of the property or service at the time of the offense[,]" or "[i]f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense[.]" Tenn. Code Ann. § 39-11-106(39)(A)(i)-(ii). Further, Tennessee Rule of Evidence 701(b) provides that "[a] witness may testify to the value of the witness's own property or services." Tenn. R. Evid. 701(b).

The Defendant contends that the only evidence connecting him to the theft was the testimony from Lance and Smith stating that they each saw the Defendant in possession of an HVAC unit. The Defendant also asserts "the HVAC unit in [the Defendant]'s possession could not have been the HVAC unit that was the subject of the theft in this case" because of the "timeline established by the State's own witnesses[.]" We note that the only unequivocal dates surrounding the theft came from the police report and Detective Carver's interviews. Detective Carver testified that the Bruces told him they believed the unit was stolen March 28, 2017, and Lance later told him, which was likewise noted in Lance's written statement that he signed, that he saw the Defendant with an HVAC unit on his property on March 28, 2017. Smith also testified that he saw the Defendant on Lance's property with an HVAC unit around March 28, 2017. With respect to the various dates, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" State v. Pope, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting State v. Hornsby, 858 S.W.2d 892, 897 (Tenn. 1993)).

Viewed in the light most favorable to the State, the evidence showed that on or around March 28, 2017, someone removed the HVAC unit from outside of the Bruces' house. Bruce testified that she did not give anyone permission to remove the unit from their house. Also, on or around March 28, 2017, Lance and Smith individually saw the Defendant with an HVAC unit on his trailer, pushed all the way to the front of the trailer such that only one side was easily visible. Lance testified that the side he was able to see was consistent with the unit that was later found in his field. Smith testified that he climbed on top of the unit in the trailer after the Defendant fled on an ATV and noticed that the unit

had insulation still attached to it, such that it appeared to have been removed from a house. He also testified that the unit he stood on and the unit found in Lance's field were "the same" based on the pictures he was shown. Lance had known the Defendant his entire life, and Smith was familiar with the Defendant before seeing him on Lance's property. At some point, the HVAC unit was removed from the Defendant's trailer and placed in Lance's field, far enough into the property that it could not be seen from the road. Lance denied stealing the HVAC unit or seeing when it was placed in his field. He estimated that the unit found in the field was 25-40 feet from the burnt camper and 15-20 feet from where had seen the Defendant's truck and trailer.

On April 1, 2017, Corporal Gray saw an HVAC unit sitting in Lance's field with insulation still attached. Later the same day, he was called to the Bruces' house to investigate a stolen HVAC unit. The Bruces' description of their stolen unit matched the unit he had observed in Lance's field. Corporal Gray observed tire tracks at the Bruces' house pointing towards Lance's property instead of the main highway. He and Detective Carver went to Lance's property and again located the HVAC unit in the field. Lance testified that three or four days passed between seeing the Defendant on his property and Corporal Gray and Detective Carver asking him about the unit in the field. The Bruces responded to Lance's property, which was three or four minutes from their house, and confirmed that the unit in the field was the same one that they reported stolen. Further, the ATV found near the unit in Lance's field was owned by the Defendant. Possession of recently stolen property, if not satisfactorily explained, is a circumstance from which the trier of fact may draw an inference and find that the person in possession knew that the property had been stolen.[6] James, 315 S.W.3d at 453; see also State v. Jadarius Sankevious Foster, No. W2020-00349-CCA-R3-CD, 2021 WL 1158156, at *13 (Tenn. Crim. App. Mar. 26, 2021). Although it was not specifically established that the Defendant actually removed the HVAC unit from the Bruces' house, the evidence is sufficient to establish that the Defendant exercised control over the unit, which, inferentially, he knew to be stolen, with the intent to deprive the Bruces of the unit. Presuming the jury afforded the State all reasonable inferences from this evidence, we conclude the evidence was sufficient to establish the Defendant's conviction for theft of property.

The Defendant also contends that Bruce's testimony that she had to pay $5,000 to replace the stolen HVAC unit was insufficient to establish the unit's value. The Defendant argues that the State should have presented proof of the unit's fair market value instead of relying solely on Bruce's testimony about the cost of the replacement unit. However, in

_____

[6] We also note that "[g]enerally speaking, 'a permissive inference is not a violation of due process because the State still has the burden of persuading the jury that the suggested conclusion should be inferred based on the predicate facts proved.'" State v. James, 315 S.W.3d 440, 450 (Tenn. 2010) (quoting Estelle v. McGuire, 502 U.S. 62, 78-79 (1991) (O'Connor, J., concurring & dissenting)).

State v. Thomas Bolton, No. W2012-02000-CCA-R3-CD, 2014 WL 12653829, at *8-9 (Tenn. Crim. App. Jan. 31, 2014), this court considered and rejected a similar argument in the context of vandalism, which utilizes the same statutory definition of "value" as theft of property. See Tenn. Code Ann. §§ 39-11-106(39)(A)(i)-(ii); 39-14-408(c)(1)(A). The Bolton court noted that "[a]lthough the statute defining value is written in the disjunctive," this court has "approved the use of replacement or repair costs to determine value when the fair market value has not been addressed and could feasibly have been determined." Thomas Bolton, 2014 WL 12653829, at *9 (citations omitted); see, e.g., State v. Kenneth Edward Watts, No. E2010-00553-CCA-R3-CD, 2011 WL 5517000, at *3 (Tenn. Crim. App. Nov. 8, 2011) (affirming defendant's convictions for vandalism and theft of property where property owner testified to cost of replacing, among other things, two stolen HVAC units, without mention of fair market value). Here, Bruce testified that the cost to replace the stolen HVAC unit, which she noted was 15 years old, with one of a similar size was $5,000. Despite the Defendant's assertion, Bruce also testified that she tried to reattach the stolen unit to her house, but it was impossible to reattach because of the damage caused when it was removed. Further, the damage was such that "they had to redo everything" when installing the new unit.

The Defendant cites State v. Larry Malone, AKA Larry Silas, No. W2010-0152-CCA-R3-CD, 2016 WL 7664767, at *4 (Tenn. Crim. App. May 5, 2016), to encourage this court, without support, to modify the Defendant's conviction to theft of property valued at $1,000 or less. The Malone court's analysis of that defendant's theft of property conviction is inapplicable to the instant case. In Malone, this court modified a defendant's theft conviction because "the State made no attempt to establish the value of the removed items." Id. at *4. Easily distinguishable is the instant case, in which the jury heard Bruce's testimony regarding the price to replace the 15-year-old unit with one of a similar size and was properly instructed on the definition of "value." However, the Malone court also concluded that the evidence was sufficient to support the valuation for the defendant's vandalism conviction where the owner of the property, which, like the instant case, consisted of HVAC units, "did not provide any information from which the fair market value of the destroyed units could be determined" but "stated that his insurance company paid him $61,000, which he used to replace and install new units." Id. From the evidence, a rational jury could conclude that the value of the stolen property was at least $2,500 but less than $10,000. Viewed in the light most favorable to the State, a rational trier of fact could conclude that the Defendant committed theft of property of $2,500 but less than $10,000. The Defendant is not entitled to relief.

The Defendant also argues that the trial court erred in failing to grant his motion for judgment of acquittal. However, "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction."

- 12 -

State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); see also State v. Blanton, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). Because a motion for judgment of acquittal is a question of law, the trial court is permitted only to review the legal sufficiency of the evidence rather than the weight of the evidence. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citing State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). Because we have already determined that the evidence was sufficient to support his conviction, the Defendant is not entitled to relief on this issue.

The Defendant finally contends that the trial court should have granted him a new trial as the thirteenth juror. Tennessee Rule of Criminal Procedure 33(d) states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d); see also State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995) (holding the trial court has a duty to serve as the thirteenth juror). Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror may an appellate court reverse the trial court's judgment. Carter, 896 S.W.2d at 122. Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995). The record shows that in denying the Defendant's motion for new trial, the trial court explicitly found that the jury's verdict was supported by the weight of the evidence and noted that it had "fulfilled its role as 13th juror in this case, ha[d] reviewed the evidence and the testimony elicited, and ha[d] upheld the verdict as supported by facts and law." Because we previously concluded that the evidence was sufficient to support the conviction, the Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE